UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.:   SA-14-CR-926-FB |
| | ) | |
| VASCULAR SOLUTIONS, INC., (1) and | ) | |
| HOWARD ROOT, (2) | ) | |
| | ) | |
| Defendants. | ) | |

UNITED STATES' RESPONSE TO DEFENDANTS'
MOTION TO TRANSFER VENUE

INTRODUCTION

The Court should deny defendants' motion to transfer venue.   The charged crimes occurred in this district, and more witnesses reside here in Texas than in Minnesota, or any other state.   Defendants have failed to meet their burden of showing that a trial in San Antonio would prevent them from calling any witness, impose expenses that they cannot afford, or pose any real threat to their business. Pursuant to a large body of relevant precedent that defendants ignore, these failures are fatal to their motion.

All eight of the substantive crimes charged in the indictment (counts 2-9) involve transactions that began and ended in this district.   The remaining charge (count 1) alleges a nationwide conspiracy to sell adulterated and misbranded medical devices to health care providers in every region in the country, with more than twenty overt acts committed in this district.   As cases involving national

conspiracies make clear, these facts cut against transfer.

Among the most important factors under Rule 21(b) is convenience to witnesses.   Defendants have not identified a single witness who cannot travel to the trial due to hardship.   Courts consistently deny transfer in cases where defendants fail to make this crucial showing.   Rather than disclosing any specific information about their own witnesses, defendants make inaccurate assumptions about who the *prosecution* will call at trial.   Notwithstanding defendants' guesswork, the United States intends to call at least ten witnesses who reside in Texas, no more than five who live in Minnesota, and approximately fifteen who reside in neither state.

There is nothing unjust about holding a trial in the same district where the crimes were committed and where defendants, a wealthy public corporation and its CEO, have conducted business for many years.   Defendants can support their motion only by relying upon irrelevant cases involving indigent defendants or persons with modest means who would face unique hardship in the absence of a transfer.   At the same time, defendants ignore a large number of relevant cases involving similarly situated defendants – corporations and executives with substantial resources who conduct business on a national scale – in which courts routinely reject requests for transfer to the corporate home office.

Defendants are uniquely equipped to handle a trial in San Antonio, a city with daily, non-stop, 3-hour flights to Minneapolis, which is in the same time zone. Vascular Solutions, Inc. (VSI) has approximately $100 million in annual revenues, a market capitalization exceeding $480 million, and more than $20 million in cash.

VSI has participated in complex litigation in courts outside of Minnesota for much of its existence, all while dramatically growing its business.   In contrast to their alarmist statements to this Court, defendants have assured investors and the media that VSI can handle this case without business disruption:   "We have the resources to vigorously contest the allegations and …. plan to make no change to our business operations or personnel as a result of this matter."

Stripped of inaccurate speculation, defendants' motion boils down to a complaint about travel and lodging expenses.   Those expenses will be small compared to defendants' wealth and the total cost of a trial in any district, but defendants would prefer to shift those costs to taxpayers by having the prosecution team and its many Texas witnesses travel to Minnesota.   This is not a basis for transfer.

## BACKGROUND

## I.   THE CONDUCT

This case concerns VSI's intentional distribution of Vari-Lase devices for unapproved use and Howard Root's leadership of that effort.   Docket Entry (D.E.) 1 at ¶ 25 (Indictment).   It also involves defendants' efforts to conceal that conduct from the FDA and law enforcement agents.   *Id.* at ¶¶ 33(c), 35, 58-63.

As the name suggests, Vari-Lase devices use laser energy to "ablate" (burn) varicose veins.   *Id.* at ¶ 11.   This shuts the veins permanently, allowing healthier veins to move the blood.   *Id.*   The FDA has approved the Vari-Lase system exclusively for the treatment of the Great Saphenous vein and other superficial

3

veins.   *Id.* at ¶ 12.   VSI's devices have never been approved for treating perforator veins, which connect the superficial vein system to the deep vein system.   *Id.* at ¶ 13.

VSI and Root were aware that they needed FDA approval to sell Vari-Lase devices for intended use in perforator veins.   *Id.* at ¶ 25.   Nevertheless, they decided to sell the devices for this unapproved intended use without such approval, a course of conduct that began in 2007, and continued through at least May 2014.   *Id.* They did this even after the FDA told VSI in September 2007, that its application for clearance to market this use was deficient because VSI had not provided any evidence that the system could safely and effectively treat perforator veins.   *Id.* at ¶19.   The conduct continued even after the FDA warned VSI, in September 2007, and again in March 2008, not to market the system without the proper authorization. *Id.* at ¶ 22.   The conduct persisted after 14% of the patients in VSI's clinical trial of perforator treatment had what were considered "major adverse events" involving deep vein thrombosis (DVT).   *Id.* at ¶ 23.   The same trial revealed that the Vari-Lase system was less effective at closing perforator veins than a competing radiofrequency device that had been approved for this use.   *Id.*   Even after VSI formally abandoned its plan to obtain FDA clearance in late 2009, Root decided to allow the sales force to continue the illegal sales.   *Id.* at ¶¶ 24-25.

Root received warnings that should have, but did not, put a stop to the conduct.   As mentioned above, the FDA's 2007, and 2008, warnings had no effect. In August 2009, a former employee sent Root a letter accusing the company of promoting Vari-Lase products for unapproved perforator use and attached sales

meeting presentations supporting the allegation.   *Id.* at ¶ 59.   Aware that VSI had

engaged in such conduct, Root presided over a sham investigation that found no

evidence of any illegal activity.   *Id.*

Throughout the sales campaign, VSI deceived both the FDA and health care

providers.   Root launched the "Short Kit" in late 2007, without approval for

perforator use by claiming the product was intended for "short vein segments" or

"short veins."   *Id.* at ¶ 58.   These vague terms enabled VSI to sell the product

without mentioning perforator veins.   *Id.* at ¶¶ 26-27.   But at the same time, VSI

and Root taught the sales force that these terms included perforator veins and urged

them to suggest to health care providers that Vari-Lase devices could be used to treat

perforator veins.   *Id.* at ¶ 58.   Consistent with this guidance, members of the sales

force used the terms "short vein segments" and "short veins" to conceal that they

were selling the devices for unapproved perforator use.   *Id.* at ¶ 35(b).

## II. DEFENSES

Defendants preview certain defenses in their motion.   For example, they

argue that they were authorized by the FDA to sell their devices for perforator use.

D.E. 12-1 at 4.   This is not accurate.   The company's own documents acknowledge

that such use was not approved.   Scavdis Decl. ¶¶ 2-4.   VSI's current and former

officers and employees will testify that they knew this and understood that

intentionally selling devices for this purpose was illegal.   Paulissen Decl. ¶ 2.

Defendants assert that they had a First Amendment right to sell medical

devices for the unapproved use of ablating perforator veins.   D.E. 12-1 at 6.

Defendants had no such right because, among other reasons, the First Amendment

does not protect false or misleading commercial speech.   *See, United States v.*

*Caronia,* 703 F.3d 149, 165 n.10 (2d Cir. 2012) ("Of course, off-label promotion that is

false or misleading is not entitled to First Amendment protection.")   VSI's illegal

sales were possible only because it deceived doctors about the devices' lack of

approval, the lack of Medicare reimbursement for procedures involving the

unapproved devices, and the failure of VSI's clinical trial to establish the safety and

effectiveness of laser perforator treatment.   D.E. 1 at ¶¶ 31-32.

### III. LENGTH OF TRIAL

The United States does not anticipate that the trial will be as long and

complex as defendants claim.   This case may be unusual, but it is not any more

complex than many of the health care fraud cases that this Court has handled.

Defendants' projection of a four to eight week trial is unsupported by any specific

facts.   D.E. 12-1 at 13.   The United States anticipates that it will need two to three

weeks for its case in chief, based on its plan of calling approximately 30 witnesses at

the rate of two or three per day.   Paulissen Decl. ¶ 4.

### ARGUMENT

### I. LEGAL STANDARD

"When an offense is begun in one district and completed in another, venue is

proper in any district in which the offense was 'begun, continued, or completed.'"

*United States v. Fells,* 78 F.3d 168, 170 (5th Cir. 1996) (quoting 18 U.S.C. § 3237(a)).

Under Rule 21(b), the Court may transfer a case "[f]or the convenience of parties and witnesses, and in the interests of justice." This Court has broad discretion in ruling on motions to transfer venue, and its decision will be upheld absent an abuse of that broad discretion. *United States v. Fagan*, 821 F.2d 1002, 1007-08 (5th Cir. 1987).

A number of courts have held that there is a general presumption that "a criminal prosecution should be retained in the original district." *United States v. Spy Factory, Inc.,* 951 F. Supp. 450, 464 (S.D.N.Y. 1997) (Sotomayor, J.); *United States v. Bowdoin*, 770 F. Supp. 2d 133, 138 (D.D.C. 2011) (same); *United States v. Haley,* 504 F. Supp. 1124, 1125 (E.D. Pa. 1981) (same); *United States v. Luros*, 243 F. Supp. 160, 174 (D.C. Iowa 1965) (same). Other courts have rejected such a presumption. *See, In re Balsimo*, 68 F.3d 185, 187 (7th Cir. 1995) (reversing district court for holding that transfer could only be granted in "truly compelling circumstances"); *United States v. Coffee,* 113 F. Supp. 2d 751, 753 (E.D. Pa. 2000) (rejecting presumption but confirming that defendant has the burden of showing that transfer is warranted). The Court need not resolve this conflict because under any standard, defendants have failed to carry their burden.

In deciding transfer motions under Rule 21(b), courts often apply the following ten factors introduced in *Platt v. Minnesota Mining & Manufacturing Co.,* 376 U.S. 240, 243-44 (1964): (1) location of defendants, (2) location of possible witnesses, (3) location of events likely to be in issue, (4) location of relevant documents and records, (5) disruption of defendant's business unless the case is transferred, (6) expense to the parties; (7) location of counsel, (8) relative accessibility of the place of trial, (9)

docket condition of each district or division involved, and (10) any other special elements.  *Spy Factory, Inc.,* 951 F. Supp. at 455.[1]  When applying these factors, quantity does not outweigh quality.  *Id.*  The Court determines which factors have the greatest importance, based on the unique facts and circumstances of the case. *Id.* at 456.

## II. TRANSFER IS UNWARRANTED

Defendants have failed to carry their burden of showing that trial in this district would be unjust or inconvenient enough to justify a transfer, and they fail to cite any factually comparable case in which a Rule 21(b) transfer motion was granted.  *See infra* at 16 n.4 and 18 n.5.

### A.    Defendants Do Not Have a Right to a Trial in Their Home District (Factor One)

Contrary to the suggestion in defendants' brief,[2] defendants do not have a right to be tried in their home district.  *Platt*, 376 U.S. at 245.  Accordingly, the location of the defendants is among the least important *Platt* factors.  *Bowdoin*, 770 F. Supp. 2d at 139-40 (defendant's location is a "very minor consideration" and "its significance derives 'solely from its relationship to the convenience of witnesses,

---

[1] The Supreme Court did not specifically adopt these factors, but lower courts have frequently applied them while recognizing that some of them are somewhat outdated.  *See, Spy Factory, Inc.*, 951 F. Supp. at 455, 458, 460

[2] Defendants begin the argument section of their brief by suggesting that it is against "public policy" to try a corporation and its CEO in a district where they do business and committed crimes.  See D.E. 12-1 at 7.  To support this assertion, defendants take the following language out of context from *Dupoint v. United States*, 388 F.2d 39, 44 (5th Cir. 1967):  "It is the public policy of this Country that one must not arbitrarily be sent, without his consent, into a strange locality to defend himself against the powerful prosecutorial resources of the Government."  *Dupoint* was a Rule 18 intra-district transfer case in which the Fifth Circuit reversed the district court for transferring the case *sua sponte* to a division *where no crime had been committed* and where the defendant, an individual accused of selling moonshine, did not reside.  Defendants' complaint that this "is precisely what the government seeks to do here" is obviously not true.

records, and counsel.'") (quoting *Jones v. Gasch,* 404 F.2d 1231, 1240 (D.C. Cir. 1967);

*see also United States v. U.S. Steel Corp.*, 226 F. Supp. 152, 157 (S.D.N.Y. 1964)

(defendants' office in Minnesota, by itself, is not grounds for transfer); *United States*

*v. Austin Co.*, 273 F. Supp. 360, 362 (S.D.N.Y. 1967) (location of corporate defendant's

principal activities is of no significance other than as a factor to be considered with

other relevant factors).

### B.   Convenience of Witnesses Supports Non-Transfer (Factor Two)

Defendants fail to provide any specifics about their Minnesota witnesses other

than stating that they will call "at least three corporate officers" and an unknown

number of employees.   D.E. 12-1 at 13.   They have not disclosed any specific

information about how many witnesses from Minnesota they will call or what those

witnesses will testify about.   A naked allegation that witnesses will be

inconvenienced by trial in a distant forum will not suffice – transfer motions must

identify the inconvenienced witnesses whom defendant proposes to call and contain a

"concrete demonstration" of the proposed witness's testimony.   *Bowdoin*, 770 F.

Supp. 2d at 139; *see also United States v. Balt. and Ohio R.R.*, 538 F. Supp. 200, 205

(D.D.C. 1982) (the "bare assertion" that a large number of witnesses from another

jurisdiction will be needed at trial is not sufficient to warrant transfer).   This failure

of proof cuts against transfer.   *See United States v. Noland,* 495 F.2d 529, 534 (5th

Cir. 1974) (although defendant alleged out of state witnesses would be

inconvenienced, he "failed to demonstrate facts from which the [Court] could have

concluded that the convenience of the witnesses and the interest of justice required

transfer"); *United States v. Jordan,* 223 F.3d 676, 685 (7th Cir. 2000) (denial of transfer motion upheld in part because defendant "failed to specify who the Puerto Rican witnesses would be and what their testimony would relate to").

Defendants also have not identified a single witness who cannot attend the trial because of inconvenience.   *Spy Factory, Inc.,* 951 F. Supp. at 456-57 (denying transfer where defendants had not shown that they were financially incapable of paying witness expenses and had not provided any witness was unable to testify because of the location of the trial); *United States v. Romans*, No. 4:11–CR–127, 2012 WL 3647849, at *2 (E.D. Tex. Aug. 7, 2012) (denying transfer in part because defendant failed "to identify a single witness who will be unable to testify at trial in the Eastern District of Texas"); *United States v. Farkas*, No. 1:10CR200 LMB, 2010 WL 3835110, at *3 (E.D. Va. Sept. 24, 2010) (denying transfer where defendant had not shown inability of witnesses to testify because of the location of the trial).

Defendants' argument regarding witness convenience relies primarily upon their guesses about who the prosecution will call at trial.   Those guesses are wrong. The United States intends to call at least ten witnesses who reside in Texas, no more than five who reside in Minnesota, and approximately fifteen who live in neither state.   Paulissen Decl. ¶ 4.   Although a trial in either forum will be somewhat inconvenient for many witnesses, this district will be the least inconvenient for the witnesses overall.   This factor supports keeping this case here in the Western District.   *See United States v. Stephenson*, 895 F.2d 867, 875 (2nd Cir. 1990) (although several considerations favored District of Columbia as a more convenient

forum, denial of transfer was appropriate because a number of government witnesses, the prosecutor, and the relevant documents were in New York).

## C.   The Crimes Occurred in the Western District (Factor Three)

The eight substantive counts in the indictment (counts 2-9) charge defendants with introducing adulterated and misbranded medical devices in interstate commerce.   D.E. 1 at ¶¶ 64-67.   Over the course of many sales visits, VSI sold the devices to a vein clinic in this district.   *Id.* at ¶¶ 54(a)-(e).   VSI sent the devices into this district in four shipments.   *Id.* at ¶¶ 65, 67.   The clinic paid for them in this district.   Scavdis Decl. ¶ 5.   A VSI representative assisted the clinic when it used the devices, in this district, to ablate perforator veins.   D.E. 1 at ¶ 54(e).   The United States will prove these facts with the testimony of witnesses who reside in this district or in Texas, and with documents that reside in databases that are accessible from this district.   Paulissen Decl. ¶ 4.

Defendants' complaint that they sold only a small number[3] of the offending devices here is irrelevant.   D.E. 12-1 at 11.   "The short answer to this argument is that the [comparatively larger] extent of the defendants' business activities in other districts in no way alters the fact that the indictment charges offenses which were committed here."   *See Luros*, 243 F. Supp. at 175-78.

The remaining charge (count 1) alleges a nationwide conspiracy, carried out by VSI's leadership and its national sales force, to sell adulterated and misbranded medical devices to health care providers in every region in the country, and to conceal

---

[3] If the amount of sales were controlling (it is not), then the appropriate forum would be the District of Connecticut, not Minnesota.   D.E. 12-4 at ¶ 13 (Weber Aff.).

that conduct from the United States.   D.E. 1 at ¶¶ 25, 30, 33(c), 35, 58-63.   The indictment alleges that at least twelve overt acts were committed in this district, including sales visits, training sessions, shipments of subject devices, and an attempt by a salesman to conceal the ongoing illegal sales from the grand jury.   *Id.* at ¶¶ 54(a)-(f), 63, 67.   Many more such acts occurred in this district, including dozens of additional short kit sales to other health care providers.   D.E. 12-1 at 11 (defendants' brief) (four customers purchased 32 kits in this district).

While defendants complain that many overt acts took place in Minnesota, they fail to explain how this will translate into any meaningful inconvenience or injustice. It is hard to make that claim here given that the relevant documents reside in databases accessible from this district and so many witnesses reside in Texas or outside of Minnesota.   Paulissen Decl. ¶ 5.   This was far from a local conspiracy. The defendants and their agents made sales in furtherance of the conspiracy throughout the country, and they committed additional overt acts in Mexico, Nevada, Utah, New York, California, Florida, Arizona, Rhode Island, Wisconsin, Massachusetts, and Maine.   Scavdis Decl. ¶¶ 7-19.

The substantial number of relevant crimes and events that transpired here and the national character of the conspiracy cut against transfer.   The court's decision in *United States v. Spy Factory, Inc.*, 951 F. Supp. 450 (S.D.N.Y. 1997), is instructive.   There, the defendants argued that most of the conduct in furtherance of the conspiracy occurred at their corporate headquarters in San Antonio.   *Id.* at 457. They further argued that they had minimal business contacts in New York, and that

out of "thousands" of allegedly illegal transactions, they made only a few isolated telephone sales to customers in New York.   *Id.*   For its part, the government pointed out that the majority of substantive counts in the complaint alleged sales of illegal devices to purchasers in New York.   The court concluded that because the alleged criminal activity "was concededly national in scope, the location of events at issue favors neither side," and denied the motion to transfer.   *Id.*

Other cases involving sophisticated defendants and national conspiracies have reached the same result.   *See Balt. and Ohio R.R.*, 538 F. Supp. at 205 (even where all but one of the meetings took place outside the district, transfer was denied because the instruments of the alleged conspiracy – the tariffs – were filed within the district); *United States v. Ashland Oil, Inc.*, 457 F. Supp. 661, 664-65 (D. Ky.1978) (even though case had a substantial connection to Minnesota, where two of the remaining three defendants resided, this did not favor transfer where the government charged a "nationwide conspiracy" that "affected customers located throughout the United States"); *see also United States v. Vogel*, No. 4:08–CR–224, 2009 WL 3273949, at *3 (E.D. Tex. Sept. 9, 2009) (nationwide character of conspiracy cut against transfer); *Farkas*, 2010 WL 3835110, at *4 (transfer to defendant's home district denied where indictment charged a nationwide fraud extending beyond that district); *Romans,* 2012 WL 3647849, at *2 (denying transfer even where the government admitted that defendant's role was to distribute narcotics in Indiana, because several co-conspirators lived in the Dallas area and the conspiracy was spread throughout the country").

### D.    Location of Documents Does Not Support Transfer (Factor 4)

The documents in this case reside in databases that can be accessed from any location with a high-speed internet location.   This factor does not support transfer. *Bowdoin*, 770 F. Supp. 2d at 138-39 (location of documents irrelevant when technology makes them accessible in any venue).

### E.    Trial in San Antonio Will Not Disrupt Defendants' Business (Factor 5)

Defendants suggest that a trial in San Antonio will cause disruption and damage to their business.   D.E. 12-1 at 13-14.   They even claim, without any factual support, that a San Antonio trial could cause harm to patients.   *Id.* at 14. These overstatements are contradicted by defendants' public statements to the media and investors.   For example, Mr. Root said recently, "The important thing for investors realize is we're going to operate business as usual…. [B]etween our personnel and our business strategy and we can operate this business while still fighting these actions."   Paulissen Decl. ¶ 6.   This is consistent with VSI's press release on November 13:   "We have the resources to vigorously contest the allegations and …. plan to make no change to our business operations or personnel as a result of this matter."   *Id.* at ¶ 7.

VSI has participated in many lawsuits in courts outside of its home state without any damage to its business.   During the past 15 years, VSI was a plaintiff or defendant in more than 15 lawsuits in courts outside of Minnesota, two of which went to trial.   *Id.* at ¶ 8.   During the same period, VSI has consistently achieved double-digit growth.   *Id.* at ¶ 9.   Defendants' litigation track record shows it is their

public statements, not the statements in their filing, that are correct – they can defend themselves in San Antonio and effectively operate their business.

Defendants manage their business remotely all the time. VSI has a national and international sales force that Mr. Root and others manage remotely. Defendants regularly do business with remote customers and suppliers. VSI's officers and employees frequently use email and phones to communicate. *See Spy Factory, Inc.*, 951 F. Supp. at 458 ("[N]o defendant has shown why telephone and fax machine communication is insufficient to maintain the minimal contact that would be available … over a lunch hour or after-hours if the trial were moved to San Antonio.") San Antonio is in the same time zone as Minneapolis, and there are several daily, three-hour flights between the cities.

These facts support denying the motion to transfer. Given the size of the business and its resources, there is no question that VSI can continue to function despite a trial outside its home state. *See Ashland Oil, Inc.*, 457 F. Supp. at 665 ("it appears that a [Minnesota-based] corporation such as Cargill with over $3 Billion in sales annually can continue to function despite the disruption of a trial in Louisville"). Just like for the Cargill executives, for Mr. Root, "[t]he trial will be somewhat disruptive whether it be in [San Antonio] or Minnesota, and it is obvious that [he] will not be able to attend to business in either [place] while he is present at the trial …." *Id.* As was the case in *Ashland Oil, Inc.*, there is "no serious disruption which would warrant transfer of this case." *Id.*; *see also Austin Co.*, 273 F. Supp. at 362 (claim of "serious disruption" to the business "far from convincing"

15

where defendants, a corporation and its president, had $40 million in sales, 1,000 employees and other officers and directors); *U.S. Steel Corp.*, 226 F. Supp. at 156 (the suggestion that having one or more top executives attend a trial in a remote district "would seriously impair the smooth functioning of these giants of industry, hardly does justice to the concept of corporate continuity …."); *Luros,* 243 F. Supp. at 175 ("There is no reason to assume a prospering business operation cannot continue to run, during the few weeks of trial, without the physical presence of the defendants.").

### F.   Expense to the Parties and Location of Counsel Do Not Support Transfer (Factors Six and Seven)

Defendants "have not demonstrated that they are financially incapable of funding their defense."   *Spy Factory, Inc.*, 951 F. Supp. at 459.   In failing to address this issue, they avoid the most important issue under the case law – their ability to bear the expense of a trial in this district.   *See Balt. and Ohio R.R.*, 538 F. Supp. at 205 ("the size of the expense concerns the Court less than whether the defendants can bear the expense"); *United States v. Culoso*, 461 F. Supp. 128, 136 n.12 (S.D.N.Y. 1978) (it is not the fact or size of any expense defendant may incur as result of trial but rather his ability to bear that expense that concerns court); *Luros*, 243 F. Supp. at 175-78 ("it is not the size of the additional expense but the defendant's ability to bear that expense, that is the relevant consideration in questions of transfer").

Unlike the parties in the transfer cases they rely upon,[4] defendants are more

---

[4]  *See, e.g., Dupoint*, 388 F.2d at 44 (defendant was a moonshiner); *United States v. Morris*, 176 F. Supp. 2d 668, 673 (N.D. Tex. 2001) (defendant exhausted his life savings on the case); *United States v. Donato*, 866 F. Supp. 288, 290 (W.D. Va. 1994) (individual who had falsely reported that her car was stolen); *Haley*, 504 F. Supp. at 1126 (all defendants were indigent); *United States v. Bein*, 539 F. Supp. 72, 7475 (N.D. Ill. 1982) (defendant and his wife operated a fledgling business); *United States v. Atwood*, 538 F. Supp. 1206, 1208 (E.D. Pa. 1982) (defendant was a

than capable of bearing the expense of trial in San Antonio.   VSI has over $100 million in annual revenues, is worth approximately $480 million, and has more than $20 million in cash.   Paulissen Decl. ¶¶ 9-10.   For years, Howard Root has been one of the highest paid CEOs in Minnesota, and his ownership of VSI shares alone, excluding other assets, make him a multi-millionaire.   *Id.* at ¶ 11.   VSI plans to spend approximately $2 million per quarter on this case, and will increase that expenditure at trial.   *Id.* at ¶ 6.   As Howard Root stated, "$2 million a quarter is not of concern to us from a cash sources perspective."   *Id.*   According to defendants' own projection, their $500,000 in expenses will be small compared to their wealth and the amount that they have spent and will spend on this case.   Further, if Defendants' motion were to succeed, the expenses saved by Vascular Solutions would then be incurred by the taxpayers, who would bear the additional expenses of sending the government's Texas-based counsel and witnesses to Minneapolis.

Defendants misstate the law when they claim that "convenience of the prosecution is *not* a factor."   Br. 14 (emphasis in original).   To support this erroneous claim, defendants cite *United States v. Lipscomb*, 299 F.3d 303, 340 (5th Cir. 2002), an irrelevant case that addresses intra-district transfers under Rule 18, which by its terms is limited only to the convenience of the defendant and the

---

retiree who made $20,000 per year); *United States v. Campestrini*, 993 F. Supp. 2d 69, 72 (D.P.R. 2014) (remote trial would shut down defendants' small family business); *United States v. Kaluanya*, No. 09-cr-107-SM, 2009 U.S. Dist. LEXIS 93817, at *2 (D.N.H 2009) (defendant was unemployed); *Coffee*, 113 F. Supp. 2d at754 (defendants "are sufficiently poor that all have court-appointed counsel").   Defendants' remaining cases are distinguishable for different, but equally obvious reasons.   *See also infra* at 18 n.5.

witnesses.[5]   Rule 21(b), by contrast, directs courts to consider the "convenience of the parties."   Under this rule, courts properly consider the impact upon government resources.   *See, e.g., Bowdoin*, 770 F. Supp. 2d at 140 (where transfer would impose burden on the government, and "[g]iven the funding emergency facing the Government, the Court declines at this time to treat it as an unlimited source of monies"); *Spy Factory, Inc.*, 951 F. Supp. at 459 (expense to the government was a relevant factor).

Defendants inaccurately claim that the "primary government team" is from "Main Justice in Washington, DC."   At least four attorneys and two case agents from the Western District (excluding supervisors) have investigated and developed this case during the past three years.   Paulissen Decl. ¶ 12.   If the case is transferred, the United States would have to move one or two of them to Minneapolis for trial, replace them with Minneapolis personnel that would have to learn the case, or use some combination of these options.   From the government's perspective, none of these options are good, and all would be costly and inconvenient.

Defendants also fail to mention that most of VSI's many lawyers are from Washington, DC, and the other is from Austin.   To make up for their lack of Minnesota lawyers (only Mr. Root has retained Minnesota counsel), defendants claim

---

[5] Defendants cite another irrelevant Rule 18 case, which also overruled a *sua sponte* transfer for failure to consider the legal standard.   *United States v. Garza*, 593 F.3d 385, 390 (5th Cir. 2010).   The remaining transfer cases relied upon by defendants are very different from this one.   *See, e.g., United States v. Benjamin*, 623 F. Supp. 1204, 1206, 1215 (D.D.C. 1985) (transfer based in part on tax code's strong preference for tax prosecutions in defendant's home district); *Donato*, 866 F. Supp. at 292-93 (transfer based in part on lack of venue over two of the counts); *United States v. Alter*, 81 F.R.D. 524, 527 (S.D.N.Y 1979) (majority of government witnesses and over one hundred defense witnesses resided in transfer district); *United States v. Lima*, No. 94CR800, 1995 WL 348105, at *1-3 (N.D. Ill. June 1, 1995) (co-defendants convicted elsewhere, majority of witnesses, events, and defendant were located in transfer district, and for co-defendant, government had argued in favor of transfer district).   *See also supra* at 16 n.4.

that two Minnesota counsel for *non-party witnesses* will be burdened if the case is not transferred.   But defendants fail to explain why Texas counsel could not effectively represent these witnesses.   Moreover, at least one prosecution witness has retained Texas counsel.   The lawyers who will work on this trial come from all over the country.   Most of them will have to travel regardless of where the trial is held.   This factor cuts against transfer.

### G.   Relative Accessibility of the Trial Site Does Not Support Transfer (Factor Eight)

San Antonio and Minneapolis are both major cities served by large airports. This factor does not support transfer.   *See Spy Factory, Inc.,* 951 F. Supp. at 460 ("'The efficiency of modern air transportation renders rather sterile any argument'" that one forum is more accessible than the other.) (quoting *U.S. Steel Corp.*, 226 F. Supp. at 158).

### H.   Docket Conditions Do Not Support Transfer (Factor Nine)

Defendants' comparison of docket conditions gives too much weight to the judicial emergency in this district and the higher felony caseload of its judges.[6] "[T]his *Platt* factor is not as concerned with overburdening judges as it is with ensuring that the particular defendant's trial is not unnecessarily delayed."   *United States v. Velasquez*, No. 14–CR–30032–MJR, 2014 WL 6977899, at *6 (S.D. Ill. Dec. 10, 2014) (rejecting defendant's argument that the court's heavier felony caseload supported transfer); *see also United States v. Donato,* 866 F. Supp. 288, 294 n.3 (W.D.

---

[6] They also overlook that federal judges in Minnesota have a higher number of total cases per judge (632) than the judges in this district (485).   Paulissen Decl. ¶ 13.   The Western District also gained an additional judge, The Honorable Robert Pittman, on December 19.

Va. 1994) (the state of the docket in each district should not form the basis for a transfer in the wake of the Speedy Trial Act); *United States v. Bein,* 539 F. Supp. 72, 75-76 (N.D. Ill. 1982) (same).

Thus, to the extent docket conditions remain a relevant factor, the most important comparison is not the number of felony cases, but how long it takes to resolve them. *Farkas*, 2010 WL 3835110, at *2 (even where the original district had a higher number of criminal cases, transfer was still unwarranted where the median time from filing to disposition was shorter in the original district). In this district, the median time from filing to disposition for criminal felony cases is 4.9 months. Paulissen Decl. ¶ 13. In Minnesota, it takes 10.4 months. *Id.* This factor supports denial of defendants' motion.

## CONCLUSION

The Court should deny defendants' motion to transfer venue.

> Respectfully submitted,
>
> RICHARD L. DURBIN, JR.
> Acting United States Attorney
>
>
> By:   _____/s/_____
> BUD PAULISSEN
> Assistant United States Attorney
> Texas SBN: 15643450
> 601 NW Loop 410
>  Suite 600
> San Antonio, Texas 78216
> (210) 384-7126 / Fax: (210) 384-7028
> bud.paulissen@usdoj.gov
>
> and

20

_____ /s/ _____
TIMOTHY T. FINLEY
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
DC Bar No.: 471841
450 Fifth Street, N.W.
Sixth Floor, South
Room 6400
Washington, D.C. 20001
202-307-0050
Timothy.T.Finley@usdoj.gov

## CERTIFICATE OF SERVICE

This is to certify that on this 22nd day of December, 2014, I filed the foregoing

pleading using the CM/ECF system which will automatically serve a copy of the

pleading upon counsel for defendants.   Those counsel are:

Attorneys for Vascular Solutions Inc.

Christopher L. Peele, Esq.
Johnny K. Sutton, Esq.
The Ascroft Law Firm
919 Congress Ave.
Suite 1500
Austin, Texas   78701

John C. Richter, Esq.
Michael Pauze. Esq.
King & Spaulding
1700 Pennsylvania Ave., NW
Washington, D.C. 20006-4707

Attorneys for Howard Root

John W. Lundquist
Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, Minnesota
55402-1425

_____ /s/ _____
BUD PAULISSEN
Assistant U.S. Attorney

21

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.:   SA-14-CR-926-FB |
| | ) | |
| VASCULAR SOLUTIONS, INC., (1) and, | ) | |
| HOWARD ROOT, (2) | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER DENYING MOTION TO TRANSFER VENUE

The Court has considered the pleadings filed by the parties, including the

declarations filed in support thereof, and the in camera filing by the United States of

America, and the Court finds that the Joint Motion of Defendants Vascular

Solutions, Inc. and Howard Root to Transfer Venue should be DENIED.

SO ORDERED on this the _____ day of December, 2014.


_____
FRED BIERY
CHIEF DISTRICT COURT JUDGE